IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRAXAIR, INC. and PRAXAIR TECHNOLOGY, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 03-1158-SLR |
| ATMI, INC. and ADVANCED TECHNOLOGY MATERIALS, INC., | ) ) ) ) | |
| Defendants. | ) | |

Jack B. Blumenfeld, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Herbert F. Schwartz, Esquire, Christopher J. Harnett, Esquire and Steven Pope, Esquire of Ropes & Gray LLP, New York, New York, Steven T. Trinker, Esquire of Praxair, Inc., Danbury, Connecticut.

Frederick L. Cottrell, III, Esquire and Alyssa M. Schwartz, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nicholas L. Coch, Esquire, Theodore J. Mlynar, Esquire and Keith A. Walter, Esquire of Kramer Levin Naftalis & Frankel, LLP, New York, New York.

**MEMORANDUM OPINION**

Dated: November 8, 2003
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

On December 22, 2003, Praxair, Inc. and Praxair Technologies, Inc. (collectively called "plaintiffs") filed this action against ATMI, Inc. and Advanced Technology Materials, Inc. (collectively called "defendants") for infringement of certain claims of United States Patent Nos. 6,045,115 ("the '115 patent"), 6,007,609 ("the '609 patent") and 5,937,895 ("the '895 patent"). (D.I. 1)

Currently before the court are the parties' numerous motions for summary judgment regarding infringement, invalidity and discovery. (D.I. 98, 123, 130, 134, 136, 138, 162, 201)

## II. BACKGROUND

Many manufacturing processes involve the use of corrosive, pyrophoric, highly toxic or otherwise dangerous gases, such as trifluoride, silane, arsine or phosphine. (D.I. 131 at 7) Gases, including highly hazardous materials, have traditionally been supplied in standard high-pressure cylinders or pressurized tanks. (D.I. 139 at 5) High pressure gas distribution systems used for delivering hazardous specialty gases in industrial operations present a potential for toxic release of gas into working areas and the environment. (D.I. 139 at 3)

### A. The Patents in Suit

The patents in suit disclose embodiments of an apparatus, which safely controls the discharge of pressurized fluids from

the outlet of pressurized tanks. (D.I. 131 at 7) The inventions disclosed by the patents help control the handling, storage and delivery of toxic fluids and constrain the flow of gas during normal operating, as well as during any kind of valve mishandling or downstream failure. Id. at 8

The '895 patent is titled "Fail-Safe Delivery Valve for Pressurized Tanks." Id. The '895 patent discloses a delivery valve that limits the release of toxic fluid delivered through the outlet of the tank. Id. The valve prevents accidental release of dangerous gases from a pressurized tank by maintaining a seal until a prescribed pressure engages the valve and opens the tank. Id. The patent claims: a port body for communication with the outlet of the pressurized tank; a valve element in or upstream of the port body and adapted for movement between a sealing position that blocks fluid flow and an open position that permits fluid flow; and a diaphragm engaged with the valve element to control the movement of the valve element so that the valve element retains the sealing position until a pressure differential between the interior of the diaphragm and the interior of the port body moves the valve element to the open position. (D.I. 131 at 9)

The '115 patent is titled "Fail-Safe Delivery Arrangement For Pressurized Containers." (D.I. 131 at 9) The '115 patent teaches inventions that may be used in combination with or

2

separately from the inventions of the '895 patent. (D.I. 131 at 10) The '115 patent teaches the use of a flow restrictor inside the pressurized container that minimizes the discharge of gas flow from the container. (D.I. 131 at 10)

The '609 patent is titled "Pressurized Container With Restrictor Tube Having Multiple Capillary Passages." (D.I. 131 at 11) Like the '115 patent, the '609 patent teaches inventions that can be used in combination with or separate from the invention of the '895 patent. The '609 patent teaches a flow restrictor in the form of multiple capillary passages, which minimize the discharge of toxic gas from the pressurized tank. (D.I. 131 at 11)

The claims asserted are: claims 3, 4, 5, 7 and 8 of the '895 patent; claims 1, 2, 6, 7 and 8 of the '609 patent; and claims 18 and 20 of the '115 patent.

### B. The Accused Products

In 1997, ATMI developed a gas cylinder product named VAC (Vacuum-Actuated Cylinder). (D.I. 139 at 6) VAC is designed to reduce the risks associated with using high-pressure toxic gases by pre-regulating the pressure at which gas leaves the cylinder with either one or two pressure regulators inside the cylinder. (D.I. 139 at 6) The VAC technology incorporates a pressure regulator in the cylinder before the valve assembly. Id. The VAC pressure regulator controls pressure using an internal

3

pressure-sensing assembly ("PSA"). (D.I. 139 at 12) The PSA is calibrated by filling an internal bellows with a helium/argon mixture to a preset pressure and sealing it. When a pressure below the PSA set point is applied downstream of the pressure regulator, the bellows in the PSA expands, opening the valve and allowing gas to flow through the regulator. (D.I. 139 at 12) The VAC products also incorporate two or three sintered[1] metal filters manufactured by Mott Corporation. (D.I. 139 at 10)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of

---

[1] The term "sintering" refers to a high temperature solid-state diffusion bonding process in which metal powder is heated to a temperature just below the melting point of metal. The metal bonds to create a porous media having a random internal structure that can be seen in a Scanning Electron Microscope ("SEM") image. (D.I. 139 at 11)

4

proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV. DISCUSSION

### A. Indefiniteness

A patent specification shall conclude with one or more claims that "particularly [point] out and distinctly [claim] subject matter which the applicant regards as his invention." 35 U.S.C. § 112, P 2 (2003). The Federal Circuit has explained that a claim satisfies section 112 paragraph 2 if one skilled in the art would understand the bounds of the claim when read in light of the specification. See Miles Labs., Inc. v. Shandon, Inc.,

5

997 F.2d 870, 875 (Fed. Cir. 1993). In determining whether this standard is met, the Federal Circuit has advised that a claim is not indefinite merely because it poses a difficult issue of claim construction. Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001). Rather, the Federal Circuit has held a claim sufficiently clear to avoid invalidity on indefiniteness grounds "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." Id. "A determination of claim indefiniteness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998). The Federal Circuit noted that "[b]y finding claims indefinite only if reasonable efforts at claim construction prove futile, [the court] accord[s] respect to the statutory presumption of patent validity, ... and [the court] protect[s] the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." Id. Claims are indefinite "if reasonable efforts at claim construction prove futile," that is, if a claim "is insolubly ambiguous, and no narrowing construction can properly be adopted." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

### 1. Flow Restrictors

Claims 1, 2 and 6-8 of the '895 patent and claims 18 and 20 of the '115 patent contain a flow restriction element.[2] As properly construed, a restrictor is a structure that serves to restrict the rate of flow of pressurized gas. Defendants' attempts to incorporate "severely limit" into the construction was rejected and, therefore, the claim is not indefinite as not defining "severely limit." Defendants' motion to hold the flow restriction limitations invalid as indefinite is denied.

### 2. Port Body

The court finds claim 1 of the '895 patent invalid as indefinite. The term "port body," used in claim 1, is not described, labeled, or coherently discussed in the patent. The meaning of the term "port body" is not discernable from the patent specification.

Plaintiffs argue that the port body is the area labeled in Figure 2 as the "valve body." '895 patent, Fig. 2: 50. The court cannot rationalize this construction for several reasons. As a starting point, the functional descriptions of "port body" found in the "Summary of the Invention" and the claims[3] are not

---

[2]Claims 1, 2 and 6-8 of the '609 patent require "a conduit with a restricted flow path." Claims 18 and 20 of the '895 patent require "a restrictor in the form of a restricted flow path."

[3]"The valve assembly includes a port body adapted for sealing engagement with the cylinder opening. A fluid inlet port

7

at all related to the written description of the preferred embodiments as illustrated in the figures.[4] For example, claim 1 states that the "valve element" can be in or upstream of the "port body." The detailed description sets forth a cylinder head valve, a valve outlet, a valve inlet, "a valve element in the form of a poppet" called a poppet valve, a valve seat, a valve seal, a valve inlet port, a valve body, a valve stem, a valve plunger, and a valve outlet. The court cannot determine what the "port body" is by looking at its relationship with the "valve element," because the term "valve element" is itself unclear. The "Summary of the Invention" states that the "port body" defines a "fluid inlet port" and a "fluid outlet port." The detailed description shows a "valve inlet," a "valve outlet," a "valve inlet port" and an "outlet port." Plaintiffs' construction of port body demands that "fluid inlet port" and "fluid outlet port" are synonymous with "valve inlet" and "valve outlet." Unfortunately, the court has no basis on which to reach

---

is defined by the port body and communicates with the cylinder opening. A fluid outlet port is defined by the port body and located outside the cylinder." '895 patent, col. 4, ll. 48-54. "[A] port body for communication with the outlet of a pressurized tank defining a fluid discharge path." '895 patent, col. 8, ll. 30-31 (claim 1) "[A] diaphragm defining an interior volume . . . engaged with the valve element . . . [by] a pressure differential between the interior volume of the diaphragm and the interior of the port body . . .." '895 patent, col. 8, ll. 37-43.

[4]No mention of a port body in the "Detailed Description of the Preferred Embodiments" or the Figures.

8

that same conclusion.

Furthermore, no ordinary meaning for the term "port body" exists. Neither party has set forth a meaning for this term, whether ordinary or as a term of art. Finally, the Detailed Description of the Preferred Embodiments sets forth multiple structures with similar names (notably, none of the names exactly match the claim language). The "port body" is related to a diaphragm by supplying a pressure differential, as set forth in claim 1. However, two different diaphragms exist in the detailed description, making it impossible to determine how the "port body" is related to "the diaphragm." In addition, as stated above, several inlets and outlets are disclosed in the detailed description, making it difficult to ascertain which are referred to in the claims that define "port body."

The court declines to speculate as to what was intended by the patentee. Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1358 (Fed. Cir. 2003). The court is forced to conclude that the term is indefinite and the claim invalid. All the asserted claims of the '895 patent are invalid as indefinite because they depend on claim 1.[5]

---

[5]Defendants also argue that the term "packing" as used in claim 4 of the '895 patent is indefinite. Because the court has already concluded claim 4 is invalid, the issue is moot. However, the court believes packing is definite and construed to mean "material packed in the conduit," because it is so described in column 4, lines 1-4, column 6, lines 56-65, and in claim 4 of the '895 patent.

### B. Infringement

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A court should employ a two-step analysis in making an infringement determination. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning and scope. Id. Construction of the claims is a question of law subject to de novo review. See Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. Markman, 52 F.3d at 976. This second step is a question of fact. See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). An accused product that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused product either literally or equivalently. See Sextant Avionique, S.A. v. Analog Devices, Inc., 172 F.3d 817, 826 (Fed. Cir. 1999). Occasionally, "the issue of literal infringement may be resolved with the step of

claim construction, for upon correct claim construction, it may be apparent whether the accused device is within the claims." Multiform Desiccants, Inc. v. Medzam, 133 F.3d 1473, 1476 (Fed. Cir. 1998). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

Defendants' motion for summary judgment of non-infringement is denied. The court finds that a genuine issue of material fact exists in determining whether a filter is a flow restrictor. The court construed the flow restrictor term in claims 1, 2 and 6-8 of the '609 patent and claims 18 and 20 of the '115 patent to mean: A structure that serves to restrict the rate of flow of gas. The patent states that "filter materials" may serve as a restrictor. ('115 patent, col. 3, ll. 24-28) Both plaintiffs and defendants have expert witnesses to address whether a filter restricts the rate of flow of gas. The issue of whether the accused product has an element that serves to restrict the flow of gas is a question of fact for the jury.

Defendants' remaining theories of non-infringement are likewise rejected as a direct result of the claim construction. The claims were not construed according to defendants' construction requiring a "severely restrict" limitation. The claims were not construed to differentiate between the size of

tanks and cylinders. The capillary tubes were not construed to require uniform bores. Finally, defendants do not present conclusive evidence that the accused product does not contain tubes, as required by claim 20 of the '115 patent. Defendants' motion for summary judgment of non-infringement is denied.[6]

### C. Dr. Glew's Expert Testimony

Two issues have resulted from the expert reports of Dr. Glew. First, plaintiffs have moved to strike invalidity defenses in Dr. Glew's May 2, 2005 expert report.[7] Plaintiffs assert that Dr. Glew's report relies heavily on prior art references that were disclosed after the close of discovery and in violation of the court's scheduling order.[8]

The second issue stemming from Dr. Glew's expert report is plaintiffs' motion to strike the July 19, 2005 supplemental expert report of Dr. Glew. Expert discovery was closed on June 29, 2005. Several depositions were taken, by agreement of both parties, in July. Dr. Glew's supplemental report was filed on July 19, 2005, close to a month after discovery was closed.

---

[6] Plaintiffs' motion for summary judgment for infringement of claims 7 and 8 of the '895 patent is denied because the asserted claims of the '895 patent are invalid as indefinite and cannot be construed.

[7] The court denies defendants' motion for leave to file a sur-reply to plaintiffs' motion to strike defenses and expert analysis.

[8] The court issued an amended scheduling order on March 28, 2005 closing fact discovery on April 15, 2005.

12

The court recognizes that the exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure and should be avoided where possible. Central Maine Power Co. v. Foster Wheeler Corp., 115 F.R.D. 295, 297 (D. Me. 1987). "However, sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities." Finch v. Hercules, Inc., 1995 WL 785100 at *9 (D. Del. 1995). The "flouting of discovery deadlines causes substantial harm to the judicial system." Id. (internal citations omitted). As a sanction for failure to comply with the scheduling order in this case, the court is authorized to exclude evidence proffered by the disobedient party. United States v. 68.94 Acres of Land, 918 F.2d 389, 396 (3d Cir. 1990).

When considering whether to exclude testimony, courts generally look to the following: "[T]he ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order, the party's intent to mislead or confuse his adversary, and the importance of the excluded testimony." Stewart v. Walbridge, Aldinger Co., 162 F.R.D. 29, 31 (D. Del. 1995) (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904 (3d Cir. 1977), overruled on other grounds, Goodman v. Lukens Steel, 777 F.2d 113 (3d Cir.

1985), aff'd, 482 U.S. 656 (1987)). Based on these considerations, the court must weigh: (1) the prejudice or surprise to the party against whom the excluded witnesses would have testified; (2) the party's ability to cure the prejudice; (3) the extent to which calling an undisclosed witness would disrupt the trial process; and (4) bad faith or wilfulness in failing to comply with the court's order. Meyers, 559 F.2d at 904-05.

The scheduling order at bar did not allow for supplemental reports. Dr. Glew's supplemental report contained new testing, conclusions and theories of invalidity not contained in his original report. The report was filed ten days before the summary judgment motions were due, so plaintiffs had no opportunity to conduct rebuttal discovery for the summary judgment motions. While the prejudice may be cured by allowing plaintiffs additional expert discovery, this would undoubtedly disrupt the trial process, as trial is set to begin in less than a month. Defendants blame the allegedly contradicting opinions of plaintiffs' experts, but this contradiction should have been evident months ago when the expert reports were filed. Finally, defendants argue that plaintiffs should have been able to question Dr. Glew on the supplemental report during the deposition. It is not plaintiffs' responsibility to study and analyze an expert report overnight to save defendants' discovery

14

flaw. No substantial justification for the delay exists, therefore, the expert evidence contained in Dr. Glew's supplemental expert report is excluded.

The second issue regarding discovery is the disclosure of prior art references during the fact discovery extension between the dates of March 21, 2005 and April 15, 2005. Defendants disclosed several new prior art references in this time period[9] and new invalidity defenses in Dr. Glew's expert report were based on these references. The court grants plaintiffs' motion to strike defendants' invalidity defenses based on these prior art references. The motion granted by the court extending discovery was to bring closure to open discovery issues, not to open new discovery issues. Therefore, prior art identified after March 21, 2005 is not admissible absent good cause. No good

---

[9] The references disclosed after this date are United States Patent Nos. 2,666,297 (the "Skousgaard patent"), 3,245,583 ("the Miller patent"), 3,897,968 ("the Allen patent"), 6,007,609 ("the Semerdjian patent"), 5,381,998 ("the Griffin patent"), 4,697,611 ("the Winland patent"), 4,275,752 ("the Collier patent"), 3,838,598 ("the Tompkins patent"), 5,080,131 ("the Ono patent"), 5,007,548 ("the Corley patent"), "How Many Wires Can Be Packed Into A Circular Conduit" by Jacques Dutka, the Semiconductor Equipment and Materials Institute, Inc. Guideline titled "Safety Guidelines For Flow Limiting Devices," and 49 C.F.R. Arguing that the plaintiffs were aware of the prior art references is not sufficient to put the plaintiffs on notice that defendants are relying on the references in their invalidity defenses. Therefore, these prior art references, and any invalidity defenses that rely on them, are stricken.

cause is shown here.[10]  Furthermore, the portions of Dr. Glew's expert report that refer to these references are stricken.

### D. Invalidity

An issued patent is presumed valid.  See 35 U.S.C. § 282. To overcome this presumption, the party challenging validity bears the burden of proving by clear and convincing evidence that the invention fails to meet the requirements of patentability. See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990).  Clear and convincing evidence is evidence that "could place in the ultimate fact finder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'"  Colorado v. New Mexico, 467 U.S. 310, 316 (1984).  The court denies defendants' motion for summary judgment on invalidity.

Defendants' motion for summary judgment relies heavily on Dr. Glew's expert report and supplemental expert report.  As a result of the court granting plaintiffs' motion to strike the belated prior art references and portions of Dr. Glew's expert report that rely thereon, and granting the plaintiffs' motion that the supplemental expert report of Dr. Glew is excluded, the court concludes there are genuine issue of material fact as to

---

[10]The court rejects defendants' argument that the new prior art was a result of plaintiffs' altered claim construction.  The claim construction amendment did not substantially or materially change the plaintiffs' theory on claim construction.

16

invalidity due to anticipation and obviousness.

### E. Declarations of Philip Chen and Christopher Jones

Defendants attached, for the first time, the declarations of Philip Chen and Christopher Jones to their reply brief in support for their motion for summary judgment of invalidity. Neither of the declarants were on the defendants' witness list. Instead, defendants argue that these declarants are rebuttal witnesses. The court concludes this evidence is not in rebuttal of any facts plaintiffs presented. The evidence is applicable to defendants' burden of proving invalidity. Presenting this evidence at such a late date in the proceedings is a violation of D. Del. LR 7.1.3 and is excluded under Fed. R. Civ. P. 16(f).[11]

### V. CONCLUSION

For the reasons discussed above, plaintiffs' motion to strike the late invalidity defenses and portions of Dr. Glew's expert report is granted, defendants' motion to file a sur-reply is denied, plaintiffs' motion for summary judgment of infringement is denied, defendants' motion for summary judgment of invalidity is denied, defendants' motion for summary judgment of indefiniteness is denied in part and granted in part,

---

[11]In addition, the Pennypack factors militate in favor of striking the Chen and Jones declarations. Plaintiffs would be prejudiced by the new evidence. Fact and expert discovery are both closed. Trial is less than a month away. There is no time to cure the prejudice. Allowing new discovery on these witnesses will undoubtably disrupt the trial of this case.

17

defendants' motion for summary judgment of non-infringement is denied, plaintiffs' motion to strike the supplemental expert report of Dr. Glew is granted, and plaintiffs' motion to strike the declarations of Philip Chen and Christopher Jones is granted. An order consistent with this memorandum opinion shall issue.